David W. CHILDRESS; Augustus G. Harvey, III; Vincent J. Matassa; Henry W. Mease; Howard S. Noyes; Daniel G. Quinney; Florian E. Stachura, Plaintiffs–Appellants,

**and**

Virginia M. Downey; Janice M. Thompson, Plaintiffs,

v.

CITY OF RICHMOND, VIRGINIA; Jerry A. Oliver, Chief of Police of the City of Richmond, Virginia, in his official capacity as Chief of Police of the City of Richmond, Virginia; Marty M. Tapscott, Defendants–Appellees.

Equal Employment Opportunity Commission; West Virginia Manufacturers Association, Amici Curiae.

No. 96–1585.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 2, 1997.

Decided Jan. 15, 1998.

of this portion of the Memorandum is thus unwarranted.

**ARGUED**: Jay Joseph Levit, Levit & Mann, Richmond, VA, for Appellants. Beverly Agee Burton, Office of the City Attorney, Richmond, VA, for Appellees. Jennifer Susan Goldstein, Equal Employment Opportunity Commission, Washington, DC, for Amicus Curiae EEOC; Niall A. Paul, Spilman, Thomas & Battle, Charleston, WV, for Amicus Curiae WVMA. **ON BRIEF**: C. Gregory Stewart, General Counsel, Gwendolyn Young Reams, Associate General Counsel, Vincent J. Blackwood, Assistant General Counsel, Equal Employment Opportunity Commission, Washington, DC, for Amicus Curiae EEOC. Eric W. Iskra, Spilman, Thomas & Battle, Charleston, WV, for Amicus Curiae WVMA.

Before WILKINSON, Chief Judge, WIDENER, MURNAGHAN, ERVIN, WILKINS, NIEMEYER, HAMILTON, LUTTIG, WILLIAMS, MICHAEL and MOTZ, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Affirmed by published per curiam opinion. Judge LUTTIG wrote a concurring opinion, in which Judge WILKINS and Judge WILLIAMS joined.

## OPINION

PER CURIAM:

This is an appeal by seven white male police officers from successive orders of the

district court that dismissed on various grounds their action alleging "hostile environment" and retaliation claims under Title VII (42 U.S.C. §§ 2000e–2(a)(1) & 3(a)) and First Amendment and procedural due process claims under 42 U.S.C. § 1983 against the City of Richmond and two of its police chiefs.

The appeal was first heard by a panel of this court which vacated and remanded for further proceedings those portions of the judgment that had dismissed the Title VII hostile environment and retaliation claims but affirmed those portions that had dismissed the § 1983 First Amendment and procedural due process claims. *See* 120 F.3d 476 (4th Cir.1997). By majority vote of the active circuit judges of this court, the panel decision was later vacated, and the appeal ordered to be reheard *en banc. See id.* at 476.

The factual background and procedural history of the case are fully set out in the vacated panel opinion (*id.* at 478–79) and need not be repeated here in full. It suffices to summarize here.

The Title VII and § 1983 claims grew out of allegedly discriminatory conduct of the complaining officers' immediate supervisor, a Lt. Carroll, that led the complaining officers first to protest, then to file Equal Employment Opportunity Commission ("EEOC") charges respecting Carroll's conduct. Specifically, the facts alleged were that Carroll had repeatedly made disparaging remarks to and about female and black members of the police force that adversely affected vital relationships and working conditions within the force; that reports and complaints about Carroll's conduct to responsible City officials by the complaining white officers resulted in no corrective action; and that following the complaining officers' filing with the EEOC of Title VII charges concerning Carroll's conduct the officers were subjected to retaliation by City officials in the form of a series of adverse employment actions.

Based on these alleged facts, the complaining officers asserted claims under Title VII that Carroll's gender and race-based harassment of black and women members of the police force had created for them a hostile workplace environment, and that the City had unlawfully retaliated against the complaining officers both for their internally registered opposition to Carroll's conduct ("opposition clause" claim) and for their having filed EEOC charges concerning it ("participation clause" claim) and claims under § 1983 that the City's retaliatory actions violated the complaining officers' First Amendment speech rights and their Fourteenth Amendment right not to be deprived of property without due process of law.

The district court dismissed the Title VII hostile environment claim on the ground that the complaining officers did not have standing under Title VII to bring an action for discrimination directed at others; dismissed the Title VII "opposition clause" retaliation claim on the ground of failure properly to exhaust administrative remedies before the EEOC; dismissed the Title VII "participation clause" claim on alternative grounds that the claim was "spurious" and that as a matter of law the officers' filing of charges was not the proximate cause of the allegedly retaliatory actions by the City; dismissed the § 1983 First Amendment claim on the dual grounds that as a matter of law the City had no policy or custom of permitting the kind of conduct charged to Carroll, and that the complaining officers' speech concerned intramural rather than public concerns; and dismissed the § 1983 procedural due process claim on the ground that as a matter of law the officers had no constitutionally protected property interest in the "teamwork" of which they claimed to have been deprived. 907 F.Supp. 934 (E.D.Va.1995) (dismissing Title VII hostile environment claim and § 1983 First Amendment and due process claims); 919 F.Supp. 216 (E.D.Va.1996) (dismissing Title VII "participation clause" and "opposition clause" retaliation claims).

■■■■ Having reheard the appeal *en banc,* we affirm the district court's judgment in its entirety. Dismissal of the Title VII "hostile environment" claim and the "participation clause" and "opposition clause" retaliation claims is affirmed by an equally divided vote of the *en banc* court. Dismissal of the § 1983 First Amendment and procedural due process claims is affirmed on the reasoning

of the district court. *See* 907 F.Supp. 934 (E.D.Va.1995).

*SO ORDERED.*

LUTTIG, Circuit Judge, concurring:

Today, the *en banc* court affirms, in my view, the judgment of the district court dismissing the instant action in which white male employees allege that their white male superiors made disparaging comments about black and female co-workers, thus subjecting these co-workers to a hostile work environment in violation of Title VII.

Title VII, which was enacted as part of the Civil Rights Act of 1964, provides that it "shall be an unlawful employment practice for an employer" "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a) & (a)(1). In addition to relying upon the Equal Employment Opportunity Commission to enforce this statutory prohibition, Congress has also created a private cause of action authorizing "aggrieved persons" to bring civil actions to enforce the act.[1]

Plaintiffs and the EEOC argue that Congress intended, through its use of the term "aggrieved persons" in Title VII, to authorize private causes of action for all persons who can satisfy Article III's standing requirements, regardless of whether those persons are themselves direct victims of an unlawful employment practice. In other words, they contend that Congress chose the phrase "aggrieved persons" in order to override all prudential standing limitations to bringing a Title VII action, effectively authorizing such actions to the limit permitted under constitutional standing doctrines. Under this interpretation, to be sure, the plaintiffs have stated a cause of action under Title VII because they allege that (1) the defendant discriminated against black and female employees in

the "terms, conditions, or privileges" of their employment by creating a hostile work environment for blacks and women, and (2) the plaintiffs have suffered a sufficiently cognizable Article III injury caused by the defendant's unlawful employment practices— namely, the breakdown of *esprit de corps* that results from working in a racially or sexually polarized environment.

Congress, however, was not writing on a clean slate when it authorized "aggrieved persons" to bring Title VII actions. In the law, the phrase "aggrieved person" has long been a "term of art" ordinarily understood to mean those persons who could satisfy *both* prudential *and* constitutional standing limitations. In fact, the Supreme Court itself has recognized as much:

> The phrase "person adversely affected or aggrieved" is a term of art used in many statutes to designate those who have standing to challenge or appeal an agency decision, within the agency or before the courts. . . . We have thus interpreted § 702 [the judicial review provision of the APA] as requiring a litigant to show at the outset of the case, that he is injured in fact by agency action and that the interest he seeks to vindicate is arguably within the "zone of interests to be protected or regulated by the statute" in question.

*Director, OWCP v. Newport News,* 514 U.S. 122, 125, 115 S.Ct. 1278, 1283, 131 L.Ed.2d 160 (1995) (citations omitted); *see also Kansas City Southern Industries v. Interstate Commerce Commission,* 902 F.2d 423, 429 (5th Cir.1990) (observing in analysis of a different statute that "[t]o determine whether a petitioner is aggrieved, we generally incorporate traditional article III and prudential standing analysis"). Among the prudential limits on standing is not only the "zone of interests" requirement, but also, of course, the general prohibition against third-party standing. That is, "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief

---

1. Section 2000e–5(f)(1) of Title VII provides that "a civil action may be brought against the respondent named in the charge (A) by the *person claiming to be aggrieved* or (B) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice." 42 U.S.C. § 2000e–5(f)(1) (emphasis added). I use the term "aggrieved person" as shorthand for, and synonymous with, the precise statutory term "person claiming to be aggrieved."

on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *see also Valley Forge College v. Americans United for Separation of Church and State*, 454 U.S. 464, 474, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982). Congress may, if it chooses, override prudential standing limitations and authorize all persons who satisfy the Constitution's standing requirements to bring particular actions in federal court. But where it has not done so, and instead has simply invoked the term of art "aggrieved person," the default rule generally is that Congress has created a cause of action only for those persons who can satisfy both types of standing requirements—constitutional and prudential.

Accordingly, because Congress used the term of art "aggrieved person" in Title VII, and chose not to define that term for purposes of that statute; because the background understanding of "aggrieved person" includes prudential limits on standing; and because one of the primary prudential limitations is that a plaintiff cannot assert the rights and interests of another, I would interpret the term "person aggrieved" in Title VII so as to incorporate the prudential rule against third-party standing. Thus, in my view, in order to qualify as a "person aggrieved" authorized to bring a Title VII action, a plaintiff must be a member of the class of direct victims of conduct prohibited by Title VII, that is, the plaintiff must assert his own statutory rights and allege that he, not someone else, has been "discriminate[d] against . . . with respect to his compensation, terms, conditions, or privileges of employment, because of [his] race, color, religion, sex, or national origin." It follows that, because the white male plaintiffs in the present case assert only the rights of third-parties to be free from race or sex-based discrimination in the workplace, they have not stated a cause of action under Title VII.[2]

Although plaintiffs and the EEOC rely upon the Supreme Court's decision in *Trafficante v. Metropolitan Life Insurance*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), not only do I find nothing in that opinion contrary to the conclusion I reach; I read that case to all but confirm this conclusion. In *Trafficante*, white tenants brought suit under Title VIII of the Civil Rights Act of 1968 against the owners of their apartment complex for allegedly discriminating against blacks in the renting of units in the housing complex. The Supreme Court held that Title VIII, which, like Title VII, authorizes "aggrieved persons" to bring civil actions to enforce its substantive prohibitions, authorizes a cause of action for any person meeting the Article III requirements—that is, any person genuinely injured by conduct that violates anyone's rights under the statute.

Unlike Title VII, which simply uses the term "aggrieved person" without definition, however, Title VIII also defines the term "aggrieved person" for purposes of that statute. And the statute defines "aggrieved person" broadly, in § 810, as "any person who claims to have been injured by a discriminatory housing practice." 409 U.S. at 206, 93 S.Ct. at 365 (quoting section 810(a) of Title VIII, today located at 42 U.S.C. § 3602(i)(1)). Thus, in *Trafficante*, the Supreme Court interpreted the phrase "aggrieved person" not as a term of art, but, rather, as a statutorily defined term. 409 U.S. at 208, 93 S.Ct. at 366; *see also Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 120–21, 99 S.Ct. 1601, 1618–19, 60 L.Ed.2d 66 (1979) (Rehnquist, J., dissenting) ("In *Trafficante* . . . we held that the broad definition given 'person aggrieved' *in § 810* indicated a congressional intent to accord apartment dwellers . . . an actionable right to be free from the adverse consequences flowing to them from racially discriminatory rental practices directed at third parties.") (emphasis added). Because the statutory definition of "aggrieved person" in

---

**2.** The white male plaintiffs have not alleged that they were discriminated against because of *their* race or sex. Indeed, and as discussed in the vacated panel opinion in this case, such an assertion would be difficult to maintain because some of the offensive comments made by plaintiffs' supervisors "were made in the presence of the

black and female officers, while others were made only in the presence of the white officers." *Childress v. City of Richmond*, 120 F.3d 476, 478 (4th Cir.1997). Thus, plaintiffs could not maintain that they were singled out because of their race or sex.

Title VIII is so broad—even using the term "injury," a term of constitutional standing that references the outer limit of Congress' power to create causes of action—it is, of course, unsurprising that the Court concluded that Title VIII clearly authorizes a cause of action for all persons who suffer a constitutionally cognizable Article III injury-in-fact resulting from unlawful housing practices. And because Congress had statutorily eliminated the prudential standing requirements through its express definition, it is likewise unsurprising that the Court held that the white plaintiffs in *Trafficante* had standing to assert a claim for the loss of interracial associations resulting from living in a racially nonintegrated housing complex: The plaintiffs had suffered constitutional injury-in-fact, even though they had not themselves been the direct victims of discrimination but were asserting the rights of thirdparty victims instead.

In notable contrast to Title VIII, Title VII does not define the term "aggrieved person." Not only does the complete absence of a definition in Title VII imply that Congress chose to incorporate the "term of art" definition of "aggrieved person," which, as discussed, includes prudential standing limitations; but the presence of a definition of the term in Title VIII juxtaposed with the absence of such a definition in Title VII strongly evidences that Congress intended different meanings for the term "aggrieved person" across the two statutes, further reinforcing the conclusion that "aggrieved person" in Title VII must be interpreted to incorporate prudential standing limitations.[3]

If any additional confirmation of the persuasiveness of this interpretation is needed, one need look only to the EEOC, the agency charged with administering Title VII. During oral argument before the *en banc* court, counsel for the EEOC herself argued—indeed, specifically on the authority of the Supreme Court's decision in *Director, OWCP v. Newport News*—that "aggrieved person" is in fact a term of art that generally incorporates *both* prudential *and* constitutional limits on standing. (Although it was unclear precisely why she believed that this observation supported the EEOC's interpretation, as opposed to the one I describe above, I suppose she thought that it followed from the fact that the term is one of art, that the same meaning should be ascribed to the term in Title VII as in Title VIII.). But then, when confronted with the next obvious question of why, only four years after it enacted Title VII without a definition of "aggrieved person," Congress would have defined the same term in Title VIII, and defined it broadly as it did, if it was not to eliminate the prudential limitations that it believed would otherwise exist by virtue of the accepted understanding of the term, the agency's counsel could offer no explanation at all. Equally revealingly, in response to the related question of whether, under the EEOC's interpretation, the definition of "aggrieved person" in Title VIII would not be superfluous, counsel also could only agree.

That the EEOC itself would have no response to the first of these questions other than the obvious one, and that it would be obliged to answer the second in the affirma-

**3.** Moreover, neither the plaintiffs nor the EEOC has cited the court to any statement in the legislative history of Title VII like that in the history of Title VIII which supports the argument that Congress intended to broaden the scope of "aggrieved" persons beyond those individuals directly victimized by unlawful employment discrimination. *See Trafficante*, 409 U.S. at 210 & n. 10, 93 S.Ct. at 367 & n. 10 (reciting that Congress intended Title VIII also to benefit those "who were not the direct objects of discrimination [who] had an interest in ensuring fair housing, as they too suffered" (quoting Hearings before the Subcommittee on Housing and Urban Affairs of the Senate Committee on Banking and Currency on S. 1358, S. 2114, and S. 2280, 90th Cong., 1st Sess. (1967))).

Nor, in further contrast of Title VII from Title VIII, is there the same need for the additional private enforcement of Title VII that the *Trafficante* Court concluded existed for Title VIII. In particular, the Court concluded that additional private enforcement of Title VIII was required because the Department of Housing and Urban Development, the agency charged with administering Title VIII, had "no power of enforcement," and the Department of Justice had only meager resources with which to enforce the Act. *Id.* at 210–11, 93 S.Ct. at 367–68. It goes without saying that the EEOC, at least today, is fully capable of enforcing the provisions of Title VII through its own enforcement proceedings, if need be. *See, e.g.,* 42 U.S.C. § 2000e–5(a) & 5(f).

tive, is, as far as I am concerned, essential confirmation of the error of the interpretation advanced by the plaintiffs and the EEOC, and in turn, of the correctness of the interpretation of Title VII upon which I primarily rest my decision today.

For these reasons, I would affirm the judgment of the district court.

Judges WILKINS and WILLIAMS join in this opinion.