Diane **LEIBOVITZ,** Plaintiff,

v.

**NEW YORK CITY TRANSIT AUTHORITY,** Defendant.

No. 95–CV–3860.

United States District Court, E.D. New York.

May 5, 1998.

Steel Bellman Ritz & Clark by Merrick T. Rossein, New York, NY, for Plaintiff.

Martin B. Schnabel, New York City Transit Authority by Barbara Neale, Metropolitan Transportation Authority, Rhonda Moll, New York, NY, for Defendant.

*Memorandum and Order*

WEINSTEIN, Senior District Judge:

## Table of Contents

I.   INTRODUCTION ....................................................146

II.  FACTS ...........................................................146

III. PROCEDURAL HISTORY ..........................................147

IV.  LAW .............................................................147
   A.   Standards of Review ........................................147
   B.   Hostile Work Environment ..................................148
      1.   Aggrieved Party .......................................148
         a.   As a Standing Limitation .........................148
         b.   As a Substantive Element .........................150
      2.   Evidence Supporting the Damages Award ...............153
      3.   Employer Liability ....................................153

V.   CONCLUSION .....................................................154

## I. INTRODUCTION

This is a pristine hostile work environment case. The plaintiff, herself a highly-regarded member of middle management, was always treated appropriately and with respect by her co-workers and by her employer. She was never discriminated against on the basis of sex, nor was she personally the target of inappropriate sexual behavior. There was, however, evidence of sexual harassment of other women in her shop that caused her emotional distress. Whether this was sufficient to create an actionable claim for hostile work environment appears to be an issue of first impression.

Plaintiff Diane Leibovitz sued the New York City Transit Authority and two of its officials, Joseph Hoffman and Monroe Easter, alleging sexual harassment and retaliation under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981a, 42 U.S.C. § 1983, the First and Fourteenth Amendments of the United States Constitution, and parallel New York state statutory and constitutional provisions.

Plaintiff's constitutional claims were dismissed at the end of trial. The statutory claims were presented to a jury. Only the defendant Transit Authority was held liable on the claim that it violated plaintiff's rights by its "deliberate indifference to widespread discriminatory practices and sexual miscon-duct against others." The jury awarded $60,000 in damages.

The defendant made timely motions under Federal Rules of Civil Procedure 50(b), 59(a) and (e), and 54(d)(1) for a directed verdict, a new trial, and remittitur. These motions are denied. Judgment is entered for the plaintiff for $60,000 without costs or disbursements.

## II. FACTS

Plaintiff is a Deputy Superintendent for the New York City Transit Authority. She joined the Authority in September of 1985 as a manager in Budget and Administration. At her own request, she was assigned to a car inspection and cleaning shop where the events in question took place.

There was no problem of a sexually harassing or gender-biased nature until approximately September of 1993. It was then that plaintiff learned that Velma Lorrick, a female car cleaner, was accusing Deputy Superintendent Russ Woodley of sexual harassment. Plaintiff questioned other female employees and was told that another woman, Joann Medina, who was allegedly harassed by Mr. Woodley, had been transferred. It was conceded that much of the alleged harassment did not occur in plaintiff's immediate vicinity and much of what she knew about the situation was second- or third-hand.

Plaintiff almost immediately spoke with Woodley; with Lenny Axelrod, Manager of Labor Relations, Division of Car Equipment, Department of Rapid Transit Operations; with Pat Davis, Director of the Car Equipment Personnel Department; and with Charles Velotta, Senior Labor Relations Director. There was evidence of a delay in the Authority's investigation of plaintiffs allegations. There was also testimony that the Assistant Chief Mechanical Officer for the North Division, Frank Raia, advised plaintiff that her complaints could be detrimental to her career.

The Authority presented proof of its procedural mechanisms for investigating and addressing harassment complaints. It did ultimately investigate the complaints and reach internal determinations on their merits.

## III. PROCEDURAL HISTORY

The parties agreed that a charge to the jury consolidating the federal and state claims was desirable. The charge addressed plaintiff's allegations that her place of employment was so permeated with sexual discrimination that it interfered with her personal right to a gender-bias-free environment.

The jury was instructed that:

Plaintiff .... claims that she was the victim of sex discrimination adverse to herself in that the Transit Authority was deliberately indifferent to sexual harassment generally. The plaintiff must show that her workplace was so permeated with discriminatory sexual behavior that was so severe or pervasive that it altered the conditions of her own employment, and created an abusive working environment for her. To be pervasive, the incidents of discrimination must be repeated and substantially continue over a substantial period of time.

The jury answered "Yes" to the question on the verdict sheet: "Did defendant New York City Transit Authority violate plaintiff Diane Leibovitz's rights by its deliberate indifference to widespread discriminatory practices and sexual misconduct against others?" It awarded her $60,000 for "Damages to date." No damages were awarded for future injury.

## IV. LAW

### A. Standards of Review

Defendant contends that the verdict reached by the jury was not supported by the evidence. Specifically, it argues that (1) plaintiff was not an aggrieved party within the protections of Title VII because she herself was not directly harassed; (2) the jury's verdict that there was an abusive working environment or that plaintiff was injured to the extent she claims was against the weight of the evidence; and (3) there was no proof that the Authority was deliberately indifferent to a violation of plaintiff's rights. Under Rules 50(b) and 59(a), defendant seeks a new trial, reduced judgment or a judgment in its favor.

Rule 50(b) authorizes a court, upon receiving a jury verdict and entering a judgment, to allow the judgment to stand, order a new trial, or direct entry of judgment as a matter of law contrary to the verdict. Fed.R.Civ.P. 50(b). Rule 59 permits a new trial to be granted. Fed.R.Civ.P. 59(a). Rule 59 also authorizes remittitur. Fed.R.Civ.P. 59(a).

Judgment as a matter of law is appropriate if there is "either an utter lack of evidence supporting the verdict, so that the jury's findings could only have resulted from pure guess-work, or the evidence is 'so overwhelming that reasonable and fair-minded persons could only have reached the opposite result.'" *Doctor's Assocs., Inc. v. Weible,* 92 F.3d 108, 111–12 (2d Cir.1996) (quoting *Baskin v. Hawley,* 807 F.2d 1120, 1129 (2d Cir. 1986)), *cert. denied,* —— U.S. ——, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997).

A new trial may be granted when the trial judge "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 370 (2d Cir.1988). "Where the resolution of the issues depended on assessment of the credibility of witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir.1992).

Defendant's contention that the award was excessive is dealt with in Part IV B 2, *infra.*

### B. Hostile Work Environment

■ Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to ... compensation, terms, conditions, or privileges of employment because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). It makes unlawful sexual harassment on both "quid pro quo" and hostile work environment grounds. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Gallagher v. Delaney,* 139 F.3d 338, 345 (2d Cir.1998). Quid pro quo harassment is based upon direct harassment—unwelcome sexual activities, advances, innuendos, and the like. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Gallagher v. Delaney,* 139 F.3d 338, 345–46 (2d Cir. 1998). Sexual harassment through a hostile work environment is less direct but no less egregious; it exists where there is a work environment that is sexually intimidating, hostile or otherwise offensive. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Gallagher v. Delaney,* 139 F.3d 338, 346–47 (2d Cir.1998).

Sexual harassment claims brought under Section 296 of the New York Executive Law—that state's Human Rights Law—are treated in a manner virtually identical to those brought under Title VII. *See Gallagher v. Delaney,* 139 F.3d 338, 344 (2d Cir. 1998); *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1177 (2d Cir.1996); *Tomka v. Seiler Corp.* 66 F.3d 1295, 1304 n. 4 (2d Cir.1995). An analysis of plaintiff's Title VII claims is therefore sufficient under both the state and the federal statutes.

### 1. Aggrieved Party

Title VII allows a "person claiming to be aggrieved ... by any unlawful employment practice" to bring suit against the employer. 42 U.S.C. § 2000e–5(f)(1)(A). The term "aggrieved" as used in Title VII is both a limitation on who can bring suit, embodying constitutional requirements of standing, and a substantive element of a Title VII claim to be proved at trial. Plaintiff is "aggrieved" in both senses.

The defendant argues that there was little, if any, compelling evidence that plaintiff herself was directly harassed. Since the jury found that the Authority did not discriminate against plaintiff because of her gender, the defendant argues, plaintiff cannot be an "aggrieved" person within the protections of Title VII. 42 U.S.C. § 2000e–5(f)(1). As a matter of law, defendant's proposition is not supportable.

#### a. As a Standing Limitation

■ Standing has two components. The first is a constitutional requirement for invoking federal-court jurisdiction, and the second consists of prudential restraints. *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

■ The constitutional component mandates adherence to Article III. It requires that the complainant have a personal stake in a "case or controversy" sufficient to merit invocation of the federal court's jurisdiction. *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The injury to the plaintiff cannot be "abstract" or "conjectural," and it must be "fairly traceable" to the opposed action, redressable, and "distinct and palpable." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (quotations omitted).

■ Plaintiff satisfied the constitutional standard. She has a personal stake in this case sufficient for her to invoke jurisdiction. Her injury is distinct and actual. There was expert and lay testimony that she was emotionally injured because of the harassing activity towards others. That harm can be redressed through a damage award. That she personally was not the direct target of noxious words or deeds does not take her claim, on these facts, outside Article III.

The prudential restraints on standing are several and have been imposed by the Supreme Court in addition to the minimum constitutional requirements. *See Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Relevant here is the

requirement that a plaintiff assert her own legal right rather than rest on the right of another. *See Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The parameters of this limitation are statutorily defined if the right to be enforced is created by statute: "Essentially, the [prudential] standing question ... is whether the ... statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

Neither the language of this statute nor its legislative history is conclusive. *See* 110 Cong. Rec. 2577–2585 (1964). "Sex" was added by Congress to Title VII at the last minute, with minimal debate and great celerity. *See* 110 Cong. Rec. 2577–2584 (1964). Legislators supporting the measure acted to eliminate inequality in the workplace based on gender with respect to hiring, promotion, pay, and task assignment. *See* 110 Cong. Rec. 2579–2582 (1964). Beyond these relatively immediate concerns, their design is unknown. Given that it was a large step towards workplace equality to guarantee women pay parity for equal work, it is unlikely that the enacting legislators envisioned how much further the Act's language could reach. Talk of specific intent is futile.

Some guidance can be gleaned from analogous Title VII cases. The broadness and lack of specificity in authorizing suit by any "person claiming to be aggrieved ... by any unlawful employment practice" has been interpreted in racial discrimination cases as evincing a "congressional intention to define standing as broadly as is permitted by Article III of the Constitution." *Hackett v. McGuire Bros.,* 445 F.2d 442, 446 (3d Cir. 1971) (racial discrimination under Title VII); *accord Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (racial discrimination in housing) (quoting *Hackett v. McGuire Bros.,* 445 F.2d 442, 446 (3d Cir.1971)). Suffering injury as a result of an employer's illegal racial employment practices not directed at plaintiff personally has been held to be sufficient for constitutional standing under Article III and

Title VII. *See Gray v. Greyhound Lines, East,* 545 F.2d 169, 176 (D.C.Cir.1976) ("since plaintiffs have claimed injury in fact as a result of defendants' allegedly illegal practices, they have standing to sue under Title VII").

In racial discrimination cases, members of one group can claim discrimination based on associational and other losses from discrimination against other groups. *See, e.g., Stewart v. Hannon,* 675 F.2d 846, 849–50 (1982) (white woman had standing to bring Title VII suit, claiming she was aggrieved by the discrimination against blacks in her workplace). Similarly, it is significant that, in considering "whether a criminal defendant has standing to raise the equal protection rights of a juror excluded from service" by a peremptory challenge based on race when the race of the juror is different from that race of the criminal defendant, the Supreme Court concluded that "[b]oth the excluded juror and the criminal defendant have a common interest in eliminating racial discrimination from the courtroom." *Powers v. Ohio,* 499 U.S. 400, 410 & 413, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *see also, e.g., Campbell v. Louisiana,* —— U.S. ——, 118 S.Ct. 1419, 1422–23, 140 L.Ed.2d 551, (1998) (affording third-party standing to white defendant when black juror was excluded from jury).

Claims based on injury due to loss of associational benefits and other injuries arguably are more compelling when the plaintiff is a member of the class discriminated against. *Compare Waters v. Heublein, Inc.,* 547 F.2d 466, 469 (9th Cir.1976) ("Whether [plaintiff] has standing to sue to enjoin discrimination against groups to which she does not belong depends on whether she is a 'person claiming to be aggrieved' "). It is not necessary at this time to address the question of whether a male worker would feel sufficiently disturbed by sexual abuse of females in his workplace to merit recovery. *See* Part IV B I b, *infra.* It is enough to find on the facts in this case that plaintiff has standing under Article III; she has a sufficient "personal stake in the outcome" of the suit to warrant the exercise of a federal "court's remedial powers on [her] behalf." *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45

L.Ed.2d 343 (1975) (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

That there are many other female employees who might have suffered injuries similar to those of one who sues, because they also were demeaned by the abusive sexual treatment of others, does not provide a reason for denying standing. A single or related series of tortious or statutory violative acts may adversely affect many people at the same time. The scope of possible liability in other cases is not relevant in determining constitutional or statutory standing in this case.

Plaintiff suffered emotional trauma. The trauma was directly traceable to the sexually harassing environment in her workplace. She sought relief through her employer; it was either denied or delayed. She has established constitutional standing.

### b. As a Substantive Element

Personal harassment is not the gravamen of a hostile work environment claim. To assume that a cause of action for hostile work environment excludes claims where the environment is hostile but the person complaining about the environment has not been personally attacked would make quid pro quo and hostile work environment virtually identical while unnecessarily restricting the layman's definition of "environment." Congress gave no indication that Title VII was designed to be so conflated. *See, e.g., Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971) (racial discrimination: "Congress chose neither to enumerate specific discriminatory practices, nor to elucidate in extenso the parameter of such nefarious activities.") (majority opinion; references to concurring and dissenting opinions omitted); *cf. Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (sexual harassment, quoting *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971)). "An aggrieved person obviously is any person aggrieved by any of the forbidden practices." *Hackett v. McGuire Bros.,* 445 F.2d 442, 446 (3d Cir. 1971).

The concept that witnessing the harassment of others can create an actionable hostile work environment was accepted in *Rogers v. Equal Employment Opportunity Comm.,* 454 F.2d 234 (5th Cir.1971). *Rogers* was an ethnic discrimination case, where a female employee with a Spanish surname filed a discrimination claim with the Equal Employment Opportunity Commission alleging that she had been terminated because of her ethnicity and that her employers, optometrists, segregated patients based on their race and ethnicity. *Rogers v. EEOC,* 454 F.2d 234, 237–38 (5th Cir.1971). In investigating the charge, the Commission served a statutorily authorized "Demand for Access to Evidence" on the employers, requesting data pertaining to or contained in patient applications. The employer refused to honor the demand, and the district court denied the Commission's request. On appeal, the Fifth Circuit, in dealing with the employee's allegation that her employer segregated patients, interpreted her claim to mean only that her employers gave their patients "different treatment depending on their ethnic origins," as opposed to assuming that the employers only allowed the complainant to assist patients of a certain ethnic origin. *Rogers v. EEOC,* 454 F.2d 234, 237 (5th Cir.1971). The Fifth Circuit held that such treatment could make the employee a person "aggrieved" within the meaning of Title VII. It noted that "the relationship between an employee and his working environment is of such significance as to be entitled to statutory protection," notwithstanding the fact that the employee herself was not personally the target of the harassing actions. *Rogers v. EEOC,* 454 F.2d 234, 237–38 (5th Cir.1971).

The reasoning of the Fifth Circuit in the *Rogers* case was invoked by the Supreme Court in the sexual harassment context in *Meritor Savings Bank, FSB v. Vinson,* which dealt with a cause of action for a hostile environment. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66–68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In assessing the claim of a woman who was allegedly sexually harassed by her supervisor, though she never sustained tangible physical or economic injury, the Supreme Court held that psychological injury was sufficient to sustain a hostile work environment claim since the terms of Title VII evince "a congressional intent to strike at the entire spectrum of

disparate treatment of men and women in employment." *Id.* at 64, 106 S.Ct. 2399 (internal quotations omitted). After considering the EEOC Guidelines, the Court held that the "EEOC Guidelines fully support the view that harassment leading to noneconomic injury can violate Title VII." *Id.* at 65, 106 S.Ct. 2399. Such "conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Id.* There was no indication that personal harassment was required. Rather, the Court cited the language from *Rogers v. Equal Employment Opportunity Commission* that " '[o]ne can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers.' " *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quoting *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971)). The Court noted, moreover, that "[n]othing in Title VII suggests that a hostile environment based on discriminatory *sexual* harassment should not be likewise prohibited," and "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Id.*

Dicta from other circuits support a broad prohibition of hostile work environments encompassing gender harassment that degrades the workplace, regardless of its initial direct targets. *See, e.g., Vinson v. Taylor,* 753 F.2d 141, 146 (D.C.Cir.1985) ("Even a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere where such harassment was pervasive."), *aff'd in part and rev'd in part,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *see also Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1014–1015 (8th Cir.1988) (Congress evinced an "intention to define discrimination in the broadest possible terms," and "evidence of sexual harassment directed at employees other than the plaintiff is relevant to show a hostile work environment"); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415–1416 (10th Cir.1987) ("one of the critical inquiries in a hostile environment claim must be the envi-

ronment." Evidence that other employees had been harassed by supervisor should be considered ... in determining whether a hostile work environment sexual harassment claim has been established"); *Henson v. City of Dundee,* 682 F.2d 897, 902 (11th Cir.1982) ("hostile or offensive atmosphere created by sexual harassment can, standing alone, constitute a violation of Title VII"); *Stockett v. Tolin,* 791 F.Supp. 1536, 1553 (S.D.Fla.1992) ("Even a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive.").

The defendant cites a Fourth Circuit case which held that white males cannot allege constitutional violations based on a hostile work environment for ethnic and racial discrimination against black males. *See Childress v. City of Richmond,* 134 F.3d 1205 (4th Cir.1998). Even assuming that this circuit or the Supreme Court would adopt the reasoning of *Childress,* that case is distinguishable. The plaintiff here was a member of the class that was harassed, making the hostile work environment particularly offensive to her in her own capacity as a female.

Also relied upon by the defendant is *Drake v. Minnesota Mining & Mfg.,* 134 F.3d 878 (7th Cir.1998). *Drake,* however, involved claims by a non-black couple alleging that they were "subjected to a hostile work environment .... due to their association with their black co-workers." *Drake v. Minnesota Mining & Mfg.,* 134 F.3d 878, 884–85 (7th Cir.1998). The jury in the instant case did not find for plaintiff on an associational discrimination claim. Rather, it found, in effect, that having to experience other women being harassed or knowing of the harassment in her own workplace caused plaintiff to become depressed, anxious, and emotionally distraught, because she felt demeaned as a member of the harassed class. The jury found, in short, that plaintiff was injured by a hostile work environment and the defendant's indifference to her plight.

Arguably, as suggested in Part IV b 1 a, *supra,* there may be a legal difference between a male alleging that he is losing the

associational benefits of female colleagues in the work environment because women were leaving due to harassment, and a woman alleging that the work environment was hostile to her personally because she was working in an environment where other women were being demoralized and abused on the basis of their gender. This further step in the law is not required to support plaintiff's claims, but it is worth considering in the instant *a fortiori* case.

Would a rare Jewish person in a Nazi concentration camp afforded privileged treatment while other Jews were being horribly persecuted have no claim for the psychological trauma of having to witness the abuse? The deterioration of the humanity, spirit, and dignity of a member of an abused class, granted personal immunity on her promise that she will remain silent—perhaps even that she will turn away and not see what is plain to see—is impermissible under fundamental ethics and law. As Primo Levi put it in his last book on the Nazi death camps, The Drowned and the Saved 86 (Raymond Rosenthal trans., First Vintage Int. Ed.1989) (1988):

> The ocean of pain, past and present, surrounded us, and its level rose from year to year until it almost submerged us. It was useless to close one's eyes or turn one's back to it because it was all around, in every direction, all the way to the horizon. It was not possible for us nor did we want to become islands; the just among us, neither more nor less numerous than in any other human group, felt remorse, shame, and pain for the misdeeds that others and not they had committed, and in which they felt involved, because they sense that what had happened around them and in their presence, and in them, was irrevocable.... It is enough not to see, not to listen, not to act.

No one would suggest that the conditions at plaintiff's workplace were comparable to those at the death camps. Nevertheless, the general principle regarding a responsible person's distress at observing other's suffering does apply. *See also e.g.,* Eugenia Semyonovna Ginzburg, Journey Into the Whirlwind 394 (Paul Stevenson & Max Hawyard trans., First Harvest ed.1975) (1967) (act of kindness of female to male prisoner in Soviet gulag).

Does the law deny that an environment where a superior refers to co-workers in vulgar sexual terms, while studiously avoiding calling one favored female profane names, is demeaning, harassing, and incompatible with the dignity and well-being of all the women in that workplace? Benign neglect by an employer under such circumstances is not permitted. A Title VII hostile work environment claim may be based on this form of discrimination because the statute affords "employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

■ There was sufficient evidence of widespread gender-based harassment for the jury to find a hostile work environment to which the Authority was deliberately indifferent. Plaintiff testified that she was told of the harassment of other women repeatedly. She complained about it to her superiors, who responded in what the jury could have found to be a passive and unconcerned manner. Julia McMillon, a union official and former subway cleaner for the Authority, testified that she repeatedly reported incidents of harassment and requested that timely remedial action be taken, and that such action was not taken promptly. She testified, moreover, that there was an underlying belief among female workers based upon experience that sexual harassment complaints would result in retaliation, regardless of the Authority's stated policy to the contrary.

Whether a work environment is so permeated with instances of sexual harassment that a reasonable person would find the environment hostile is a question to be answered by a jury considering the totality of the circumstances, the context of the behavior, and reasonable perceptions of the allegedly harassing words and acts. *See Gallagher v. Delaney,* 139 F.3d 338, 347 (2d Cir.1998); *cf. Harris v. Forklift Sys.,* 510 U.S. 17, 21–23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The jury analyzed the totality of the circum-

stances and came to a defensible conclusion that Plaintiff's superiors and the Authority allowed an actionable hostile working environment to develop and fester.

2. Evidence Supporting the Damages Award

■ The defendant argues that the damages awarded by the jury, $60,000 for "Damages to date," were excessive and should be reduced.

■ Under New York law, applicable to the state phase of this case under *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a jury's damage award should be set aside by a trial judge if "it deviates materially from what would be reasonable compensation." CPLR 5501(c); *see Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 116 S.Ct. 2211, 2220–21, 135 L.Ed.2d 659 (1996). Though phrased as an instruction to state appellate courts, the "deviates materially" standard controls federal trial judges applying state substantive law. See *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 116 S.Ct. 2211, 2218–19, 135 L.Ed.2d 659 (1996). This standard is more rigorous than the traditional "shock the conscience" standard applicable to the federal substantive aspect of the case. *Geressy v. Digital Equip. Corp.*, 980 F.Supp. 640, 653 (E.D.N.Y.1997). It tightens the range of acceptable jury awards. *Id.*

■ Damages awarded for emotional distress must be shown by either (1) credible testimony regarding the mental anguish or (2) corroboration of the suffering, through medical proof, or a showing of the circumstances. *See Walker v. AMR Servs. Corp.*, 971 F.Supp. 110, 117 (E.D.N.Y.1997). "[W]hile emotional injures cannot be measured with precision, ... they are ... real;" New York state courts have sustained sizable damage awards in sexual harassment cases based on emotional injury. *McIntyre v. Manhattan Ford, Lincoln–Mercury, Inc.*, N.Y. 128889/94 (Supreme Court, New York County 1997) ("as the Talmud aptly recognized, 'humiliation murders the soul;' " $650,-000 damage award, citing other New York sexual harassment cases where the jury awards for emotional injury were in the hundreds of thousands of dollars) in N.Y.L.J., Sept. 11, 1997, at 25; *see Gleason v. Callanan Indus.*, 203 A.D.2d 750, 752, 610 N.Y.S.2d 671, 673 (3d Dep't 1994) (jury award of $54,000 for compensatory damages sustained on testimony of insomnia, depression, and mental shock).

Plaintiff testified about her depression, inability to sleep, weight gain, anxiety and other symptoms of depression. Dr. Fiester, a psychiatrist, confirmed the extent and substance of her complaints. Based on New York state jury verdicts in sexual harassment cases, the jury award does not deviate materially from relevant jury awards. It is not excessive under either state or federal standards.

3. Employer Liability

■ An employer can be held liable for the sexually harassing behavior of its supervisors if "a) the supervisor was at a sufficiently high level in the company, or b) the supervisor used his actual or apparent authority to further the harassment, or was otherwise aided in accomplishing the harassment by the existence of the agency relationship, or c) the employer provided no reasonable avenue for the complaint, or d) the employer knew (or should have known) of the harassment but unreasonably failed to stop it." *Torres v. Pisano*, 116 F.3d 625, 634 (2d Cir.) (footnotes omitted) (emphasis added), *cert. denied*, —— U.S. ——, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997). The Authority argues that it cannot be held liable for a hostile work environment because it had and followed internal procedures for preventing and addressing sexual harassment.

That the Authority had internal mechanisms for dealing with harassment complaints does not prevent a factual finding that it was deliberately indifferent to the sexually harassing actions of supervisors if the internal procedures were insufficient or were not adhered to. *See, e.g., Gallagher v. Delaney*, 139 F.3d at 347–48 (2d Cir.1998) ("the issue of employer remediation must go to a jury charged with deciding the credibility of witnesses and with drawing appropriate infer-

ences"); *cf. Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1181 (2d Cir.1996) (the "question of whether an employer has provided a 'reasonable avenue of complaint' is a question for the jury;" assessment of the response of the employer to known inappropriate conduct should be by the jury). Whether action taken to prevent or remedy harassment and discrimination is reasonable is an issue which must be "determined upon the facts in each case." *Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2d Cir.1986) (racial discrimination), *affirming Snell v. Suffolk County*, 611 F.Supp. 521 (E.D.N.Y.1985).

The jury could have credited plaintiff's testimony about the Authority's failure to adhere to its internal procedures. Specifically, Charles Velotta, Senior Director of Labor Relations for the Department of Subways, testified that he knew of plaintiff's concerns; she had spoken with him, and she was very upset. Velotta testified that, though he was familiar with sexual harassment literature, he had little formal training on the subject. Frank Leslie, assistant vice president for the Division of Equal Employment Opportunity, testified that he was aware of allegations that some Authority employees reported sexual harassment complaints to their immediate supervisor and were afforded no relief. He also was concerned that some managers who received reports of sexual harassment might find it in their best interest to fail to pursue the complaints. He admitted that he could not affirmatively state that all managers and supervisors in the Authority had received sexual harassment prevention training. Either the training of Velotta or Leslie, as the senior officials in labor relations, or their inadequate response to plaintiff's complaints could have been viewed by the jury as deficient. *See, e.g., Gallagher v. Delaney*, 139 F.3d 338, 347–48 (2d Cir.1998).

Given the testimony of plaintiff, McMillon, Leslie, and Velotta, the jury could find that the Authority's procedures for preventing harassment and for dealing with existing harassment were not reasonable, and that the Authority therefore should be liable for a hostile working environment. The jury's finding can not be disregarded.

## V.  CONCLUSION

The jury's verdict will not be set aside, nor will its award be altered. Enter judgment for the plaintiff without costs or disbursements. The issue of legal fees is referred to the Magistrate Judge.

SO ORDERED.