**Michele SHEPARD, Plaintiff,**

v.

**FRONTIER COMMUNICATIONS SERVICES, INC. and Michael Zufall, Defendants.**

No. 98 Civ. 4742 (WCC).

United States District Court, S.D. New York.

April 10, 2000.

Joseph A. Maria, P.C., White Plains, NY (Frances Dapice Marinelli, of counsel), for Plaintiff.

Littler Mendelson, P.C., New York City (Mark J. Potel, Regina G. Del Priore, of counsel), for Defendants.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Michele Shepard brings this case against her former employer, Frontier Communications Services, Inc. ("Frontier") and her former supervisor, Michael Zufall, alleging sexual harassment and retaliatory termination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the United States and New York State Constitutions, § 40–c of the New York Civil Rights Law and the New York Executive Law, § 296, *et seq.* Defendants now move under Federal Rule of Civil Procedure 56 for summary judgment. For the reasons stated below, defendants' motion for summary judgment is granted in full.

## BACKGROUND

### I. *Frontier*

Frontier provides integrated communications, including Internet, long distance, local telephone, data, and conferencing, to business customers nationwide. (Defs.Rule 56.1 Stmt. ¶ 1.) While the sales department actually sells the services, numerous departments provide sales support. The client services department is responsible for supporting accounts and approving initial orders. (*Id.* at ¶ 4.) The engineering department confirms the technical feasibility of orders. (*Id.* at ¶ 5.) The credit department ensures that a new client has good credit and the provisioning department actually implements the orders. (*Id.* at ¶ 6.)

Within the sales department, Frontier has two types of General Managers, National Accounts Key Accounts ("NAKA"), and Business. (*Id.* at ¶ 7.) Frontier hired Michele Shepard as NAKA General Manager in November 1996. (*Id.* at ¶ 8.) Shepard received a salary and monthly commissions based on estimated revenues out of the Shelton, Connecticut and Elmsford, New York Frontier offices. (*Id.* at ¶¶ 8–9.) Shepard managed the customer accounts of Frontier's Shelton and Elmsford offices. She essentially co-managed these offices with the General Manager of Business of the Shelton Office, David Gordon, with whom she also lived and had a personal relationship. (*Id.* at ¶ 11.) Shepard supervised a staff of five or six sales professionals. (*Id.* at ¶ 13.) Shepard reported to Daniel Boynton, Vice President of Sales for New England, who worked out of the Woburn, Massachusetts office. (*Id.* at ¶¶ 14–15.) Boynton reported to defendant

Michael Zufall, the President of Frontier's Northeast Region. (*Id.* at ¶ 16.)

Account representatives at Frontier report to General Managers and are responsible for the sale of services. (*Id.* at ¶ 17.) When account representatives sell services, they complete a sales order called a "Dedicated Service Order" ("DSO"). (*Id.* at ¶ 18.) Clients commit on a DSO to a monetary amount known as a Monthly Usage Commitment ("MUC"). (*Id.* at ¶ 19.) Based upon the MUC amount, the account representatives calculate the estimated monthly revenue for each order. (*Id.* at ¶ 21.)

According to defendants, Shepard was responsible for reviewing the DSO and the former carrier bills provided by a new client in order to ensure the client's creditworthiness. (*Id.* at ¶¶ 22–23.) Plaintiff asserts that contrary to defendants' statements, plaintiff did not approve DSO's. Plaintiff states that new sales orders are not the responsibility of client services. According to defendants, after Shepard approved the order, the DSO and accompanying paperwork were forwarded to client services and the engineering department for review and approval. (*Id.* at ¶ 24.) Upon approval by these departments, a billing account was created. (*Id.* at ¶ 25.) The order for services remained in a pending status until the credit department reviewed and approved the new client's credit history. (*Id.* at ¶ 26.) The provisioning department coordinated implementation of the services. (*Id.* at ¶ 26.)

## II. *Plaintiff's Allegations of Sexual Harassment*

Plaintiff asserts that she was required to attend lunch on company time with Zufall and two other female managers. (Am. Complt.¶ 15.) On one occasion, in the car on the way to the luncheon, plaintiff states, Zufall "allowed, encouraged and permitted one of the female employees, Rachel Garifo, to grab his leg, put her hands in his lap, and various other overtures." (*Id.* at ¶ 16.) Plaintiff states that this action made her uncomfortable. (Defs.Rule 56.1 Stmt. ¶ 43.) The tone of the conversation be-

tween Garifo and Zufall was not sexual in nature. (*Id.* at ¶ 44.) It was Garifo's idea to touch Zufall's leg, and despite plaintiff's assertions in the Amended Complaint that Zufall encouraged this conduct, plaintiff testified that Zufall did nothing to encourage Garifo except laugh after his leg was touched. (Pl.Dep. at 102–03, 107.) Immediately after returning to the office from the luncheon, plaintiff reported the leg-touching incident to her supervisor, Boynton. (*Id.* at 112–13.)

Plaintiff further alleges that Zufall required plaintiff and other employees to drive him to branch offices and accompany him to lunch or dinner. Although plaintiff asserts in her response to Defendants' Rule 56.1 Statement that "[i]t is well accepted that only woman [sic] accompanied Zufall to the offices," she puts forth no evidence to support this statement. Because "mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment," plaintiff's unsupported allegations about Zufall's conduct cannot create a material issue of fact. *Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir.1996).

Plaintiff also alleges, and defendants admit, that on numerous occasions Zufall addressed plaintiff as "princess" and "queen." (Complt.¶ 18(c); Defs.Rule 56.1 Stmt. ¶ 53.) Plaintiff has testified that she viewed these nicknames as "sexist" rather than "sexual." (Pl.Dep. at 192.) On February 4, 1997, after Zufall asked Shepard to attend a business dinner and Shepard refused, Zufall remarked, "I'm not good enough to go to dinner with." (Defs. Rule 56.1 Stmt. ¶ 56.) On March 18, 1997, after she failed to return his telephone call, plaintiff received an e-mail from Zufall stating "my usefulness must be at an end because you don't even call me back when I call you any more." (*Id.* at ¶ 58.) Plaintiff reported Zufall's e-mail to Boynton. (*Id.* at ¶ 61.) Plaintiff has testified that she did not perceive Zufall's e-mail as being sexual in nature. (Pl.Dep. at 185.) Later in March 1997, Shepard again re-

fused Zufall's invitation to a business luncheon. (Defs.Rule 56.1 Stmt. ¶¶ 62–63.) Plaintiff believed that Zufall grew angry when she refused his invitation. (Complt. ¶ 18(i).)

Plaintiff testified during her deposition that Zufall never communicated a desire to date or become involved sexually with plaintiff, nor did Zufall ever touch her in a sexual way. (Pl.Dep. at 191.)

Plaintiff complained to Boynton about Zufall's conduct on numerous occasions. Plaintiff alleges that Boynton told her that if she were his wife, he would be upset. (Pl.Resp.Defs.Rule 56.1 Stmt.[1]) In late 1996 or early 1997, Boynton called Human Resources to report Zufall, but at plaintiff's request, Boynton did not mention plaintiff's name. (Defs.Rule 56.1 Stmt. ¶ 70.) Boynton told the human resources representative that the employee had not been touched, propositioned, or spoken to with improper language by Zufall. (Id. at ¶¶ 74–75.) The representative told Boynton that nothing significant had occurred. (Id. at ¶ 76.) Boynton called Human Resources a second time after plaintiff was being investigated for improper business procedures. (Id. at ¶ 77.)

### III. *Investigation of Plaintiff's Business Practices*

In June 1997, Tonya Thompson, an account representative that reported to plaintiff, called Zufall. (Id. at ¶ 80.) Thompson alleged that plaintiff was harassing her and had asked her to perform unethical business procedures. Specifically, Thompson alleged that plaintiff had directed her to delete poor credit information from a prior bill provided by a client so that the order would be approved. (Id. at ¶ 81.) Zufall contacted Leslie Tarnacki, employee relations manager, to report Thompson's complaint. (Id. at ¶ 83.) Tarnacki flew to New York from Michigan in order to investigate the charges against

plaintiff. Over the course of a full day, Tarnacki conducted an investigation into plaintiff's business activities by interviewing about ten employees. (Id. at ¶ 86.)

Tarnacki's investigation revealed that a number of DSO's under plaintiff's control were improperly altered at her behest and plaintiff had ordered account representatives to exaggerate estimated monthly revenues. (Id. at ¶¶ 90–91.) In addition, Tarnacki learned that plaintiff had misrepresented a client's credit-worthiness in order to obtain approval for a new account. (Id. at ¶ 94.)

In another incident, an existing client requested that calling cards be sent to them within twenty-four hours. (Id. at ¶ 100.) According to Tarnacki's investigation, the order was almost complete when plaintiff had the order pulled in order to create a new account with all new paperwork so she could receive monetary compensation for the additional revenue. (Id. at ¶ 101.) Account representatives also told Tarnacki that plaintiff insisted that they "cut and paste" documents. (Id. at ¶ 104.) Thompson alleged that Shepard directed her to remove an overdue balance from a client's previous bill and move the amount to current charges so that the client would have a better credit rating. (Id. at ¶ 107.) Distraught over plaintiff's alleged unethical business practices, Thompson called Zufall to offer her resignation. (Id. at ¶ 110.)

Tarnacki also discovered that plaintiff had arranged to have two of her relatives hired and assigned to work for Gordon. (Id. at ¶ 111.) This was a violation of Frontier's anti-nepotism policy. (Id.)

After Tarnacki completed her interviews, she and Zufall tentatively decided that Shepard and Gordon should be dismissed. On or about June 23, 1997, Boynton, Tarnacki and Zufall made the final

---

1. This Court notes that contrary to common practice, plaintiff's Rule 56.1 statement is not in the form of numbered paragraphs and does not specifically refer to the defendants' statements in their Rule 56.1 statement that plaintiff is disputing. Plaintiff also failed to number the pages of the statement. Therefore, any citations to plaintiff's Rule 56.1 statement in this opinion will be general references.

decision to dismiss Shepard and Gordon. (*Id.* at ¶ 119.)

In response, plaintiff argues that the investigation was improper and biased, but does not deny the allegations of her improper business activity. Plaintiff asserts that "those individuals [that Zufall] chose to be interviewed all had serious personal conflicts with plaintiff." (Pl.Am. Mem. at 22.) Specifically, plaintiff alleges that there was tension between NAKA and General Business. (*Id.* at 18.) Plaintiff also alleges that Thompson had a drinking problem, was in therapy, and had been reprimanded by plaintiff for her failure to keep appointments. (Pl.Dep. at 300–03.) Zufall testified that he heard accusations that Thompson had a drinking problem and reported it to human resources. (Zufall Dep. at 86–87.) Although other employees, including Thompson, were involved in plaintiff's alleged unethical business practices, only plaintiff was investigated. Further, plaintiff argues that it was Gordon, not plaintiff, who hired her relatives.

## IV. *Frontier's Sexual Harassment Policy*

In 1995, Frontier issued a comprehensive policy to protect its employees from unlawful sexual harassment, discrimination and retaliation. (Defs.Rule 56.1 Stmt. ¶ 28.) The policy outlined the procedure for reporting a complaint of harassment. (*Id.* at ¶ 29.) Defendants assert that every employee received a copy of Frontier's Personnel Policies and Practices Manual, which included the sexual harassment policy. (*Id.* at ¶ 30.) Plaintiff argues that she never received a copy of the sexual harassment policy. (Pl.Resp.Defs.Rule 56.1 Stmt.) However, plaintiff testified that the manual sat on her bookshelf during her employment with Frontier. (Pl. Dep. at 231.) Defendants also assert that in March 1997, every Frontier employee received the Human Resources Bulletin outlining an updated sexual harassment policy. (Defs.Rule 56.1 Stmt. ¶ 31.) It is undisputed that plaintiff did not review nor was she aware of the existence of the sexual harassment policy. (Defs.Rule 56.1 Stmt. ¶ 37.) Plaintiff did review the manual for other purposes. (*Id.* at ¶ 38.)

Further, defendants assert that Frontier conducted periodic training on sexual harassment for supervisors, and as a General Manager, plaintiff was responsible for following and enforcing the policies. (*Id.* at ¶¶ 33, 35.) However, plaintiff testified that she was not trained with regard to the sexual harassment policy at Frontier. (Pl. Dep. at 233.) Gordon also testified that although he received training on Frontier's sexual harassment policy when he was first hired and was aware that there was a human resources bulletin on sexual harassment, he never received a manual. (Gordon Dep. at 108–09, 152.)

## V. *The Amended Complaint*

Plaintiff's "First Claim" is that "defendants violated plaintiff's rights as guaranteed her by reason of Title VII of the Civil Rights Act of 1964." (Am.Complt.¶ 28.) This Court will interpret that claim as a sexual harassment claim. Plaintiff's "Second Claim" states that "[u]nder the premise and by defendants' retaliatory conduct, plaintiff's rights as guaranteed her by reason of Title VII of the Civil Rights Act of 1964 have been violated." (*Id.* at ¶ 30.) Plaintiff's "Third Claim" alleges that "[u]nder the premise, the plaintiff's United States Constitutional Rights have been violated." (*Id.* at ¶ 32.) Plaintiff's "Fourth Claim" states "[u]nder the premise, the plaintiff's New York State Constitutional Rights have been violated." (*Id.* at ¶ 34.) Plaintiff's "Fifth Claim" alleges that "defendants' conduct has violated plaintiff's rights pursuant to Section 40–c of the New York State Civil Rights Law and Section 296 *et seq.* of the New York Executive Law." (*Id.* at ¶ 35.)

## DISCUSSION

### I. *Summary Judgment Standard*

A district court may grant summary judgment only if the evidence, viewed in

the light most favorable to the party opposing the motion, presents no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion. *See Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995). The party seeking summary judgment has the burden of showing that no genuine factual dispute exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

## II. *Local Rule 56.1*

Defendants' argue that all of plaintiff's claims should be dismissed because she failed to comply with Local Rule 56.1 by "neglecting to submit a statement of material facts." (Def. Reply Ltr. at 6.) Local Rule 56.1 of the District Court of the Southern District of New York requires, in pertinent part, that

(b) The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

(c) All material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party.

Local Rule 56.1(b) and (c).

Plaintiff failed to submit a statement of disputed material facts with her opposition to defendants' motion for summary judgment, which was served upon defendants on December 20, 1999. However, plaintiff did serve defendants with a statement of disputed facts on January 25, 2000, when her sur-reply was served.

Although failure to comply with Local Rule 56.1 is grounds for deeming admitted the facts contained in defendants' Rule 56.1 statement, we are not required to do so. *See Balut v. Loral Electronic Systems,* 988 F.Supp. 339, 343 (S.D.N.Y.1997) (Conner, Senior J.). Although not timely, plaintiff did eventually provide this Court and defendants with a Rule 56.1 statement of disputed facts. Therefore, this Court will not deem all of the material facts set forth in defendants' Rule 56.1 statement as admitted.

However, plaintiff's Rule 56.1 statement includes several statements of disputed facts that are not supported by a citation to the record. Local Rule 56.1(d) requires that "[e]ach statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." Local Rule 56.1(d). Although not grounds for deeming all of the material facts set forth by defendants' Rule 56.1 statement as true, this Court will not consider any statements made by plaintiff in her Rule 56.1 statement that are not supported by a citation to the record. *See Frooks v. Town of Cortlandt,* 997 F.Supp. 438, 445 n. 1 (S.D.N.Y.1998) (Conner, Senior J.).

## III. *Plaintiff's Affidavits*

Of additional concern is plaintiff's failure to sign her affidavit submitted in support of her opposition to defendants' motion for summary judgment. The Affidavit of Michele Shepard, attached to the Affidavit of Frances Dapice Marinelli, plaintiff's attorney, was not signed by plaintiff when it was served upon defendants on December 13, 1999, although a signed copy was filed with the Court. Only after defendants pointed out plaintiff's failure to sign her affidavit in their Reply Letter, and this Court allowed plaintiff to submit a sur-reply on the instant

motion, did plaintiff submit a signed affidavit to defendants. Although this Court recognizes the difficulty defendants faced in preparing a reply to opposition papers supported by an unsigned affidavit, we will consider plaintiff's affidavit because a signed copy was filed with the Court and defendants were on notice of the content of plaintiff's affidavit by having an identical unsigned copy.

Defendants also argue that plaintiff's affidavit is inadmissible because it is not in conformity with Federal Rule of Civil Procedure 56(e). Rule 56(e) states in relevant part:

> ... opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matter stated therein.

Fed.R.Civ.P. 56(e).

Defendants argue that plaintiff's affidavit contains inadmissible hearsay and immaterial statements. A court may "strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements." *Hollander v. American Cyanamid Co.,* 172 F.3d 192, 198 (2d Cir.1999). Paragraph 14 of plaintiff's affidavit states: "Boynton informed me that there had been prior lawsuits against Zufall for sexual harassment. Subsequently he advised me of Zufall referring to me as 'queen' and that he was concerned about it." Although this is an out of court statement offered for its truth, an admission by a party-opponent is not considered to be hearsay. *See* Fed. R.Evid. 801(d)(2). Under this rule, "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship," is admissible as a party admission. Fed.R.Evid. 801(d)(2)(D).

■ Here, Boynton is an employee of defendant Frontier. As Vice President of Sales for New England, Boynton reported to Frontier's President, Michael Zufall, and was plaintiff's supervisor. (Boynton Aff. ¶¶ 2, 3.) Under Frontier's sexual harassment policy, "any individual alleging sexual harassment should report the incident to his or her human resources manager, supervisor, or any other department manager in a formal written complaint...." (Def.Ex. B.) Although plaintiff was speaking to Boynton, and not making a written complaint, it was within the scope of Boynton's employment to discuss any allegations of sexual harassment with plaintiff. Therefore, Boynton's alleged statements to plaintiff in the context of her reports of sexual harassment were statements made within the scope of Boynton's employment. Plaintiff has alleged that defendants knew that Zufall sexually harassed female employees, but failed to prevent this harassment. Without ruling on these specific allegations, to the extent that Boynton's alleged statements admit that defendants knew about Zufall's treatment of women, the statements are party admissions and admissible. *See* Fed. R.Evid. 801(d)(2)(D).

Defendants also argue that plaintiff's affidavit and memorandum of law abound with immaterial statements, such as references to Tonya Thompson being intoxicated and "in therapy." To the extent plaintiff relies on immaterial allegations to support her claims, this Court will disregard such allegations and, in deciding the motion, will consider only assertions of material fact based upon personal knowledge. *See Gittes v. GMIS, Inc.,* No. 95 Civ. 2296, 1999 WL 500144 at *7 (S.D.N.Y. July 15, 1999).

Lastly, defendants argue that Exhibits A, C, F, G and J to plaintiff's affidavit should be disregarded because the documents were responsive to defendants' discovery requests, specifically Nos. 3, 5 and 7, but were never produced. Under Federal Rule of Civil Procedure 37(c), a party may not use evidence on a motion that was responsive to discovery requests or a required disclosure under Federal Rule of

Civil Procedure 26(a), but was not disclosed.

■ Plaintiff's Exhibit A is a "Sample Order Flow Process." The document is an illustration of the process by which an order is completed at Frontier. Plaintiff does not identify the document's origin or whether it is of her own creation. In addition, this document is responsive to Request No. 5 of defendants' First Request for Production of Documents. (Def. Reply Ltr., Ex. A.) Request No. 5 asks for "[a]ll documents that refer, reflect, or relate in any way to your duties, obligations and requirements of your positions held with Frontier." The Sample Order Flow Process identifies plaintiff's duties regarding the processing of a sales order. Because Exhibit A is responsive to defendants' discovery request and plaintiff failed to disclose it, Exhibit A will not be relied upon in consideration of the instant motion.

Exhibit C includes two electronic mail messages from Tonya Thompson to plaintiff and plaintiff's notes from her "one-on-one" conversation with Thompson regarding Thompson's work performance. These documents are not responsive to any of defendants' discovery requests. The documents do not refer to plaintiff's employment history with Frontier (Request No. 3), to plaintiff's duties at Frontier (Request No. 5), or to any communication between plaintiff and a Frontier employee concerning the terms and conditions of plaintiff's employment with Frontier or the termination thereof (Request No. 7). In fact, the documents concern the conditions of Thompson's employment. To any extent that Exhibit C is relevant, it may be relied upon in consideration of this motion.

Exhibit F includes a facsimile order for installation of services and a letter from Tonya Thompson to a Frontier customer with a handwritten notation from plaintiff indicating that the "pricing is completely incorrect." Again, these documents relate to Thompson's job performance, not to plaintiff's employment or termination. To any extent that Exhibit F is relevant, it

may be relied upon in consideration of this motion.

Plaintiff's affidavit does not identify Exhibit G. However, Exhibit G appears to be plaintiff's handwritten notes regarding her problems with some of the employees that she supervised. Again, these notes do not concern plaintiff's employment or termination from Frontier. Therefore it was not responsive to defendants' discovery requests and plaintiff's failure to disclose Exhibit G does not prevent consideration of the Exhibit.

Exhibit J is not identified by plaintiff's affidavit. Exhibit J appears to be a series of electronic mail messages that were forwarded together by plaintiff to Leslie Tarnacki. A message from Michelle Kola, a Frontier sales representative, states that she is "aware of what is going on. I just want to say, since I am not involved, my only complaint is that I haven't had more of your time!" (Pl.Ex. J.) Plaintiff forwarded Kola's message to Tarnacki, stating that she was "not sure what she is referring to in the message below." (*Id.*) These messages relate, at least in part, to the investigation of plaintiff that led to her termination. By relating to plaintiff's termination, Exhibit J is responsive to defendants' Request for Production of Documents No. 7. Request No. 7 asks for: "All documents that refer, reflect or relate in any way to any conversation, communication or meeting between you and any current or former employee of Frontier concerning the terms and conditions of your employment with Frontier or the termination thereof." Because plaintiff did not produce Exhibit J in response to defendants' discovery requests, this Court will not rely upon it in consideration of the instant motion.

## IV. *Plaintiff's New York State Claims*

Plaintiff's Fifth Cause of Action asserts claims pursuant to Section 296 *et seq.* of the New York Executive Law and Section 40–c of the New York Civil Rights Law. (Am.Complt.¶ 35.) Sexual harassment and

retaliation claims brought under Section 296 of the New York Executive law are treated in a manner virtually identical to those brought under Title VII. *See Gallagher v. Delaney*, 139 F.3d 338, 344 (2d Cir.1998). Therefore, plaintiff's state law claims will be analyzed in tandem with her Title VII claims.

■ Plaintiff also alleges that defendants violated N.Y. Civil Rights Law § 40-c, which provides that "[n]o person shall, because of race ... be subjected to any discrimination in h[er] civil rights ... by any other person or by any firm, corporation or institution ..." N.Y.Civ.Rights Law § 40-c (McKinney 1992). However, as defendants correctly note, a plaintiff must first notify the Attorney General of the State of New York at or before commencing an action under that section. N.Y.Civ.Rights Law § 40-d (McKinney 1992). Failure to comply with that statutory prerequisite mandates dismissal of the claim. *Silver v. Equitable Life Assurance Soc'y*, 168 A.D.2d 367, 368, 563 N.Y.S.2d 78, 80 (1st Dep't 1990). Here, plaintiff has not alleged that she filed a timely notice with the New York Attorney General. Accordingly, summary judgment shall be entered against plaintiff on this claim.

### V. *Plaintiff's Claims Against Zufall Individually*

Plaintiff's claims against defendant Zufall, for sexual harassment and retaliation, are based upon violations of plaintiff's Title VII rights and violations of New York Executive Law § 296 *et seq.* (Am.Complt. ¶¶ 28, 30.)

■ As to the Title VII claims, the Second Circuit has held that "individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir.1995), *abrogated on other grounds, Burlington Ind. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). *"Tomka* and the language of Title VII compel a holding that only employer-entities have liability under Title VII." *Smith v. New York City Bd. of Educ.*, No. 96 Civ. 3486, 2000 WL 64873, *4 (S.D.N.Y. Jan.25, 2000), *quoting McBride v. Routh*, 51 F.Supp.2d 153, 157 (D.Conn.1999). Therefore, claims pursuant to Title VII against Zufall must be dismissed.

■ As to the claims pursuant to New York Executive Law § 296 *et seq.*, the Second Circuit in *Tomka* found that "a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under [§ 296]." *Tomka*, 66 F.3d at 1317. Similarly, § 296 provides that individuals may be held liable for their acts of employment discrimination. *See, e.g., Sacay v. Research Found. of the City Univ. of New York*, 44 F.Supp.2d 496, 503–04 (E.D.N.Y. 1999). Although a minority of state courts have disagreed with the holding of *Tomka*, *see, e.g., Trovato v. Air Express Int'l*, 238 A.D.2d 333, 334, 655 N.Y.S.2d 656, 657 (2d Dep't 1997), *Tomka* is the law in this Circuit. Therefore, this Court will follow the majority of courts and consider the merits of plaintiff's claims pursuant to § 296 against Zufall individually.

### VI. *Plaintiff's Sexual Harassment Claim*

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1). The Supreme Court has made clear that Title VII's language "is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment," which includes requiring people to work in a discriminatorily hostile or abusive environment. *Meritor Sav. Bank*,

*FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

A claim for hostile work environment must show conduct that is "sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive work environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal citations omitted). An occasional offensive or teasing comment is not sufficient. *Id.* The alleged harassment must be such that a reasonable employee in the person's shoes would have found the working environment hostile. *Torres v. Pisano,* 116 F.3d 625, 631 (2d Cir.1997). Further, the victim must perceive the environment as subjectively hostile. *Harris,* 510 U.S. at 21, 114 S.Ct. 367. In judging a hostile work environment, the court must look to the totality of the circumstances including "the frequency of the conduct; its severity; whether it is physically threatening or humiliating . . .; and whether it unreasonably interferes with an employee's work performance." *Id.* at 18, 114 S.Ct. 367.

Although plaintiff alleges several incidents in which Zufall harassed her, the conduct could not be considered frequent or pervasive. Plaintiff alleges, and defendants admit, that Zufall called her "queen" and "princess" on at least four occasions. Further, plaintiff alleges, and defendants admit, that Zufall often asked plaintiff and other employees to drive him to meetings or to accompany him to business luncheons or dinners. Plaintiff also alleges, and defendants admit, that in the car on the way to a business luncheon with Zufall and two other employees, another female employee, Rachel Grifo, touched Zufall's leg. Finally, plaintiff alleges, and defendants admit, that Zufall sent her an e-mail after she did not return his calls stating that he felt he had "outlived his usefulness."

Although plaintiff's allegations amount to more than a single episode of harassment, in order to establish a hostile work environment the "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Carrero v. New York City Housing Auth.,* 890 F.2d 569, 577 (2d Cir.1989). In *Torres,* the plaintiff alleged that her supervisor "constantly harassed her—so often that she 'lost count' . . ." and the court found that if Torres' allegations were true, she could establish a hostile work environment. 116 F.3d at 631. In *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 61–62 (2d Cir.1992), the plaintiff established a hostile work environment by putting forth evidence of "repeated episodes of vulgar comments and gestures" and offensive treatment that "took place on a regular basis." In contrast to the plaintiffs in *Torres* and *Kotcher,* plaintiff has alleged episodic and isolated incidents. Plaintiff puts forth evidence of only one electronic-mail message, four incidents of name calling, and one incident where another employee touched the alleged harasser, all over approximately seven months of employment at Frontier. Even considering repeated requests to attend business meals with Zufall and other employees, these incidents are far less offensive and less frequent than those suffered by the plaintiffs in *Torres* and *Kotcher.*

■ Defendants assert that any incidents relating to other women have no relevance to plaintiff's complaint regarding harassment because they were not directed at her personally. A claim for hostile work environment, however, does not require that the harassing conduct be directed at the person bringing suit. *Leibovitz v. New York City Transit Auth.,* 4 F.Supp.2d 144, 150 (E.D.N.Y.1998) (citing cases that have followed this analysis). It is the work environment that is significant. *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997). Restricting claims only to those to whom the harassment occurred personally would unduly limit the scope of the provision. *See Leibovitz,* 4 F.Supp.2d at 150. Further, placing such a limit on claims for hostile work environment ignores the psychological damage caused by

oyees yees to drive him to meetings and attend business luncheons and dinners. Even if it were true that Zufall favored women, this Court fails to see how an environment in which women employees are favored could be a hostile work environment for plaintiff, a female employee. Further, it was Grifo's idea to touch Zufall's thigh and Zufall did nothing to encourage her, except to laugh after he was touched. (Pl.Dep. at 103–04.) Grifo's voluntary and unsolicited decision to touch Zufall's thigh cannot be considered evidence of Zufall's alleged harassment and creation of a hostile work environment.

 Zufall's conduct, while perhaps annoying and inappropriate, was not sufficiently egregious or sexual in nature to create a hostile work environment. Title VII is not intended to act as a general civility code. *Harris*, 510 U.S. at 20, 114 S.Ct. 367. In *Kotcher*, the harassing supervisor made comments to the effect that if he had the same "bodily equipment" as the plaintiff, he would have more substantial sales. 957 F.2d at 61. In addition, the supervisor in *Kotcher* often made obscene gestures behind plaintiff's back, in front of others at the store, and made numerous comments about another female employee's breasts. *See id.* (finding hostile work environment existed on the basis of these facts). In *Torres*, the plaintiff established a prima facie case that the male supervisor's conduct created a sexually hostile work environment based on allegations that the supervisor repeatedly referred to her by a derogatory term used to describe a part of the female anatomy, suggested that she was in the habit of performing oral sex for money, ridiculed her pregnancy, and repeatedly commented upon the plaintiff's anatomy and his desire to have sex with her. 116 F.3d at 629. Similarly egregious was the conduct of the supervisor in *Leopold v. Baccarat, Inc.*, 174 F.3d 261, 265 (2d Cir.1999), who threatened to fire the saleswomen, repeatedly said that he "wanted young and sexy on the sales floor," said that one of the plaintiff's co-workers had a high number of sales because "she flirts and attracts all the male customers," told the plaintiff that "for your age you're in very good shape," and screamed a derogatory term used to describe a part of the female anatomy at the saleswomen at a Christmas dinner.

In contrast to the conduct of the supervisors in *Kotcher, Torres* and *Leopold,* Zufall sent plaintiff an electronic-mail message stating that he had "outlived his usefulness," called plaintiff "queen" and "princess," and asked plaintiff to attend several business luncheons or dinners with other male and female employees. Even if this Court were to consider the incident where Grifo touched Zufall's thigh in front of plaintiff as evidence of a hostile work environment, looking at the totality of the circumstances, no reasonable person would have found the working environment to be hostile.

Even if a reasonable person would have found a hostile environment at Frontier, plaintiff has not proven that she perceived the environment as hostile. Although plaintiff testified that the electronic-mail message from Zufall made her "upset and uncomfortable" because she "was afraid of not being in good favor with [Zufall]," plaintiff also testified that she saw nothing of a sexual nature in the electronic-mail message from Zufall. (Pl.Dep. at 178, 185.) Further, plaintiff testified that although she felt uncomfortable about Zufall asking her out to a business lunch, she did not consider it a sexual advance. (*Id.* at 191.) It is undisputed that Zufall never touched plaintiff physically or in any sexual way, and never expressed an interest in having sex with plaintiff or even dating plaintiff. (*Id.* at 191–92.) Finally, in regard to Zufall calling plaintiff "queen" and "princess," plaintiff testified that she "con-

sider[s] it a sexual connotation. It is sexual language. It is sexist." (*Id.* at 192.) When asked whether the language was "sexist or sexual," plaintiff answered that she considered it sexist. (*Id.*)

Faced with her own deposition testimony, plaintiff submitted an affidavit stating, in relevant part:

11. While I was employed by Frontier, I was harassed by Zufall. Advances of a sexual nature that he made under the guise of being work-related offended me. I was also threatened by Zufall's reactions, fearing for my job if I did not comply with his wishes.

12. The actions, reactions, verbal comments, and written communications of Zufall, seen in context and in the totality of circumstances, were sexual in nature and created an uncomfortable, inappropriate, and hostile environment for me to work in.

13. My definition of "sexual" has always related to the act of having sex. "Sexist" is a term I have always used to describe a discriminatory act. Since "sexual harassment" refers to discriminatory acts that are sexual in nature, I use "sexist" and "sexual" interchangeably to describe such acts.

(Pl.Aff.¶¶ 11–13.)

■ These statements in plaintiff's affidavit directly contradict her deposition testimony in which she repeatedly stated that Zufall's actions and comments were not sexual in nature. It is well settled in the Second Circuit that a party's affidavit which contradicts her own prior deposition testimony should be disregarded on a motion for summary judgment. *See Buttry v. General Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir.1995). Therefore, plaintiff cannot create a factual issue for jury consideration by asserting in her affidavit that she perceived Zufall's actions as sexual advances after testifying to the contrary at her deposition.

However, even if plaintiff did subjectively perceive a hostile work environment, because we find that no reasonable person could objectively find that Zufall's actions created a hostile work environment, plaintiff fails to establish a prima facie case of sexual harassment and summary judgment is appropriate on plaintiff's sexual harassment claims under Title VII and New York State Executive Law § 296 *et seq.* against both Frontier and Zufall. Further, because we find that plaintiff failed to establish a prima facie case of sexual harassment, we need not consider defendants' assertion of the affirmative defense set forth by the Supreme Court in *Faragher v. City of Boca Raton*, 524 U.S. 775, 793, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 755, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

## VII. *Plaintiff's Retaliation Claims*

Plaintiff alleges that she was fired in retaliation for complaining about Zufall's alleged sexual harassment. Retaliation claims under Title VII are tested under the three-step burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g., Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1177 (2d Cir.1996); *Tomka*, 66 F.3d at 1308. First, the plaintiff must make out a prima facie case of retaliation. *See id.* Second, the defendant then has the burden of articulating a legitimate, non-retaliatory reason for the complained of action. *See id.* Third, if the defendant meets its burden, the plaintiff must adduce evidence "sufficient to raise a fact issue as to whether [the employer]'s reason was merely a pretext" for retaliation. *See id.* at 1309. Therefore, even where the plaintiff has established a prima facie case of retaliation, as plaintiff has here, summary judgment will be granted for the defendant if the plaintiff fails to meet her burden of proving pretext by a preponderance of the evidence.

### A. *Plaintiff's Prima Facie Case*

To establish a prima facie case of retaliation, a plaintiff must show: "(1) partic-

ipation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Gallagher v. Delaney,* 139 F.3d 338, 349 (2d Cir.1998). The plaintiff's burden at this stage is slight; she may establish a prima facie case with *de minimis* evidence. *See Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 465 (2d Cir.1997).

To be considered a "protected activity" under the civil rights laws, a complaint alleging sexual harassment "need not take the form of a formal claim filed by an administrative agency ... [it] may simply be an objection voiced to the employer." *Barcher v. New York Univ. School of Law,* 993 F.Supp. 177, 184 (S.D.N.Y.1998) (quoting *Iannone v. Frederic R. Harris, Inc.,* 941 F.Supp. 403, 410 (S.D.N.Y.1996)). The plaintiff need not establish that the conduct she opposed was in fact harassment; she need only show a "good faith, reasonable belief that the ... challenged actions of the employer violated the law." *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988). "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances." *Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir.1998).

Plaintiff engaged in protected activity by complaining to Boynton about Zufall's conduct. Even if the conduct plaintiff complained of was not in fact harassment, she has established that she had a good faith, reasonable belief that Zufall's conduct was sexual harassment. Zufall's responses to plaintiff for refusing repeated invitations to lunch and dinner and for failing to return phone calls could reasonably be interpreted as harassment. Plaintiff had a good faith, reasonable belief that Zufall, her superior at work, expected to receive a certain amount of attention and time from the female employees at Frontier, and became upset when he did not receive attention from plaintiff. Plaintiff has testified that Zufall's conduct made her uncomfortable and caused her to be afraid of not being in good favor with him. (Pl.Dep. at 178.) Considering the evidence in the light most favorable to plaintiff, she engaged in protected activity by complaining about Zufall's alleged sexual harassment.

Plaintiff satisfies the second element of the prima facie case because she suffered an adverse employment action when she was terminated.

As to the third element, a causal connection may be established either indirectly by showing that the protected activity was followed closely by adverse treatment, or through other evidence, such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against the plaintiff by the defendant. *See Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991). To withstand summary judgment plaintiff need only show that there is a genuine issue of material fact surrounding the existence of "a retaliatory motive [that] play[ed] a part in the adverse employment actions", i.e., that retaliation was a motivating factor. *Padilla v. Metro–North Commuter R.R.,* 92 F.3d 117, 122 (2d Cir.1996) (bracket in original) (quoting *Dominic v. Consolidated Edison Co.,* 822 F.2d 1249, 1254 (2d Cir.1987)), *cert. denied,* 520 U.S. 1274, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997).

The timing of plaintiff's termination is not evidence of a causal connection in this case. Although it is not clear from the record the exact date that plaintiff first complained to Boynton about Zufall's alleged harassment, Boynton testified that in late 1996 or early 1997, he called human resources at plaintiff's request for the first time. (Defs.Rule 56.1 Stmt. ¶ 70.) Plaintiff also complained to Boynton about Zufall's electronic-mail message that she received in response to her failure to return Zufall's telephone call on March 18, 1997. (*Id.* at ¶¶ 58, 61.) Plaintiff was terminated on or about June 23, 1997. (*Id.* at ¶ 119.) Even assuming that plaintiff complained to Boynton throughout the first few months of 1997, it was not until months later, in

June, that plaintiff was terminated. Thus, to any extent that the temporal relation between plaintiff's complaints and her termination is evidence of the presence or absence of a causal connection between them, it tends more to show the lack of such connection.

Defendants argue that "the decision-makers, Zufall and Tarnacki, were not aware of any complaint by Shepard when they decided to dismiss her," thus there could be no causal connection between plaintiff's termination and her complaints about Zufall. (Def. Reply Ltr. at 5.) However, there may be a disputed issue of fact as to who the "decision-makers" were, and as to whether they knew about plaintiff's complaints.

Plaintiff repeatedly complained to Boynton about Zufall's conduct. Boynton was part of the conference call where the final decision was made to terminate plaintiff. (Defs.Rule 56.1 Stmt. ¶¶ 119–20.) Defendants' own statement of the undisputed facts states that "Boynton, Zufall and Tarnacki conferenced by telephone ..." and continues "[t]hey decided to dismiss Shepard and Gordon ..." Boynton participated in the conference call, and although Boynton testified that he was told to "let her go," he may have participated in the decision to terminate plaintiff.

Further, Boynton called Frontier's human resources department on two occasions at plaintiff's request. The first time, in late 1996 or early 1997, Boynton did not identify plaintiff by name. Defendants assert that Boynton placed a second telephone call to human resources on plaintiff's behalf after the investigation of plaintiff's business practices had commenced. (Defs.Rule 56.1 Stmt. ¶ 78.) Even if the investigation of plaintiff's business practices had already commenced, the final decision to terminate plaintiff's employment was not made until after Frontier received plaintiff's complaint about Zufall.

■ Finally, although Thompson admitted that she falsified an order and Zufall knew that Thompson had come to work under the influence of alcohol, defendants never investigated Thompson's work performance. (Zufall Dep. at 85–87.) In fact, Zufall reported this information about Thompson to Tarnacki during the same telephone call in which he reported problems regarding plaintiff. (*Id.* at 87.) Despite these reports of potential misconduct on Thompson's part, defendants chose to investigate plaintiff only. By showing that fellow employees were neither investigated, nor terminated, for allegedly engaging in similar and related misconduct, plaintiff has established a sufficient causal connection between her complaints of sexual harassment and her termination to demonstrate a prima facie case. *See DeCintio v. Westchester County Med. Center,* 821 F.2d 111, 115 (2d Cir.1987) (finding causal connection because fellow employees were not disciplined for identical behavior); *McKnight v. Dormitory Authority of State,* 189 F.R.D. 225, 234 (N.D.N.Y.1999) (finding causal connection because African–American plaintiff's medical documentation excusing absences from work was treated differently from that of similarly situated Caucasian).

### B. *Defendants' Legitimate Reasons for Terminating Plaintiff*

Under the *McDonnell Douglas* paradigm, once plaintiff establishes her prima facie case, the burden of going forward shifts to defendants to articulate a legitimate, non-discriminatory reason for its actions. Here, defendants assert that plaintiff was terminated because Tarnacki's investigation revealed that plaintiff had committed multiple inappropriate business practices, including improperly altering a number of DSO's, "cutting and pasting" documents, and arranging to have her relatives hired by Frontier in violation of its anti-nepotism policy. Defendants' assertion of plaintiff's improper business activities is sufficient to satisfy their minimal burden.

## C. *Pretext*

Once defendants have proffered a legitimate, non-discriminatory reason for the challenged employment action, "the presumption raised by the prima facie case is rebutted, and drops from the case." *See Bickerstaff v. Vassar College*, 196 F.3d 435, 446 (2d Cir.1999). To defeat defendants' motion for summary judgment, plaintiff is obliged to produce not simply "some" evidence, but "sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason for the discharge." *Woroski v. Nashua Corp.*, 31 F.3d 105, 110 (2d Cir.1994) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515–17, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). However, a "Title VII plaintiff may not prevail by establishing only pretext, but must prove, in addition, that a motivating reason was discrimination." *Fields v. New York State Office of Mental Retardation and Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997).

 Here, plaintiff alleges that all of the people that Tarnacki spoke to during her investigation of plaintiff's business practices were selected by Zufall and had serious personal conflicts with plaintiff. In other words, plaintiff argues that Zufall directed Tarnacki to speak to people that he knew would say negative things about plaintiff's performance on the job. It is undisputed that Zufall's telephone call to Tarnacki precipitated the investigation of plaintiff. (Defs.Rule 56.1 Stmt. ¶¶ 83–85.) However, the fact that Zufall, the alleged harasser, was the individual that commenced the investigation against plaintiff is not sufficient to show pretext. In *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir.1998), the court found that a reasonable trier of fact could doubt the employer's legitimate reason for terminating the plaintiff, poor performance, because the negative evaluations of her work were generated by two of the plaintiff's alleged harassers after she complained of harassment. In contrast, even though Zufall precipitated the investigation of plaintiff's work performance, he was not responsible for supplying any of the information relied upon in Frontier's determination that plaintiff had engaged in unethical business practices. Tarnacki interviewed numerous employees who provided information supporting the allegations that plaintiff improperly altered DSO's and misrepresented clients' credit.

Plaintiff also argues that defendants should have investigated Tonya Thompson for her involvement in the alleged unethical business practices. However, defendants' failure to investigate Thompson does not change the fact that evidence was found during the investigation to support the allegations that plaintiff cheated her employer by relying on false documents to increase her commissions.

Significantly, plaintiff does not challenge any of the evidence offered to support defendants' legitimate reason for terminating her employment. Moreover, even if the serious allegations of improperly altering documents, misrepresenting clients' credit-worthiness, and manipulating the sales process in order to increase her own commissions were untrue, defendants were convinced, on the basis of a complete investigation, that plaintiff committed these wrongs against the company. Regardless of whom Tarnacki interviewed in her investigation of plaintiff and whether Tonya Thompson should have been investigated as well, no reasonable jury could find that defendants' legitimate reasons for firing plaintiff were pretextual.

Because no reasonable jury could believe that defendants' legitimate reason concerning plaintiff's unethical and improper business practices was a mere pretext for retaliation, we need not consider whether defendants' other legitimate reason, plaintiff's alleged violation of the anti-nepotism policy, is pretextual.

In addition to failing to show pretext, plaintiff has not shown that retaliation was the real reason for her termination. Plain-

tiff argues that Zufall was on "a quest to fire plaintiff." (Pl.Mem. at 22.) The only evidence put forth in support of this argument are plaintiff's allegations that Zufall directed the investigation of plaintiff's business practices to effect the outcome of the investigation. However, it is unlikely that Zufall would have been able to convince the numerous employees interviewed and Tarnacki to falsify allegations regarding plaintiff. Further, the decision to terminate plaintiff was made by Zufall, Tarnacki, and perhaps Boynton. Plaintiff does not allege, and puts forth no evidence that Tarnacki or Boynton had a retaliatory animus.

Even considering the evidence in the light most favorable to plaintiff, no disputed issues of material fact exist as to whether plaintiff's termination was in retaliation for her reporting Zufall for sexual harassment. Defendants' articulated reasons for firing plaintiff, that she falsified, or ordered that her subordinates falsify, business documents in order to increase her commissions, are legitimate and nondiscriminatory. Given the evidence gathered by Tarnacki's investigation of plaintiff, no reasonable trier of fact could infer that retaliation played a part in defendants' decision to terminate plaintiff. Accordingly, defendants' motion for summary judgment is granted as to plaintiff's retaliation claims pursuant to Title VII and New York Executive Law § 296 *et seq.*

### VIII. *Plaintiff's Third and Fourth Causes of Action*

Plaintiff's "Third Claim" alleges that "[u]nder the premise, the plaintiff's United States Constitutional Rights have been violated." (Am.Complt. at ¶ 32.) Plaintiff's "Fourth Claim" states "[u]nder the premise, the plaintiff's New York State Constitutional Rights have been violated." (*Id.* at ¶ 34.) Plaintiff has not specified which provision of the United States and New York State Constitutions defendants have allegedly violated. However, "[t]he failure in a complaint to cite a statute [or a specific provision of the Constitution], or to cite the correct one, in no way affects the

merits of a claim. Factual allegations alone are what matters." *Albert v. Carovano,* 851 F.2d 561, 571 n. 3 (2d Cir.1988). The factual allegations in plaintiff's amended complaint form the basis of allegations of statutory violations, not of constitutional violations because no state action is alleged. Plaintiff's claims pursuant to Title VII and New York Executive Law § 296, which have been considered upon their merits, are the appropriate means for plaintiff to seek remedy for the violation of her civil rights by private parties. Therefore, summary judgment is granted as to plaintiff's "Third Claim" and "Fourth Claim" and those claims are dismissed.

### CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted in full. The Clerk of the Court shall enter judgment for defendants.

SO ORDERED.